# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

BRIAN PHILLIP CASS,

                            Plaintiff,

       v.                                    6:14-CV-1509
                                               (MAD/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

PETER W. ANTONOWICZ, ESQ., for Plaintiff
VERNON NORWOOD, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On October 13, 2011, plaintiff protectively filed[1] applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") Benefits, alleging disability beginning June 15, 2001. (Administrative Transcript ("T.") at 12, 177-191). Plaintiff's claims were denied initially on February 6, 2011. (T. 75-76).

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

Plaintiff requested a hearing, which was held by video conference on April 11, 2013 before Administrative Law Judge ("ALJ") Sandra D. Lord, and at which plaintiff and Vocational Expert ("VE") Jane F. Beougher testified. (T. 26-74). The ALJ issued a decision denying the applications on May 22, 2013. (T. 9-25). The ALJ's determination became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on October 17, 2014. (T. 1-6).

## II.  **APPLICABLE LAW**

### A.  **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

2

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

B.    **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389,

3

401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  <u>FACTS</u>

As of the date of the administrative hearing in April 2013, plaintiff was 39 years old.  (T. 31).  Plaintiff had completed the ninth grade in regular education classes, and obtained his General Equivalency Degree in 1994. (T. 44-45).  He was divorced, with

one adult son, and a fourteen year old son who lived with plaintiff's mother. (T. 284). Plaintiff had resided at his mother's home at the time that he applied for benefits, but lived on his own at the time of the hearing. (T. 42-43, 284-85).

Plaintiff was incarcerated for most of the period from 1994 to 1998, due to a burglary conviction and three separate parole violations. (T. 33, 284). Plaintiff was also incarcerated from 2001 to 2011 after being convicted of burglary and robbery. (T.36, 187, 284). Plaintiff attributed his criminal record to substance abuse, but reported that he had not used illegal drugs since 2001. (T. 45-46, 283). He met regularly with his parole officer. (T. 43).

Prior to his 2001 conviction, plaintiff had a limited work history that included brief periods of employment as a hospital janitor, flower delivery driver, and cook at a casual restaurant. (T. 37-38, 51-62, 220). At the hearing, plaintiff described difficulties with concentration, anxiety, and following instructions at each position that led to his termination or resignation. (T. 37-38, 51-62). For example, plaintiff abruptly left his cook position after a few weeks due to the pressure of keeping up with the pace of orders, and testified that he "dropped the spatula and walked out" during the middle of his shift after a waitress yelled at him for making a mistake on an order. (T. 52-53). Plaintiff had not worked after being released from prison on October 6, 2011. (T. 37, 280).

Plaintiff testified that he now believed that he had suffered from depression, anxiety, and obsessive compulsive disorder ("OCD") for most of his adult life, although he did not realize it at the time. (T. 34, 38). He was diagnosed with OCD during a drug

rehabilitation program, but did not receive any formal psychiatric evaluation until a consultative examination was performed by Dr. David Stang in connection with plaintiff's benefit applications in December 2011. (T. 34, 280). Dr. Stang became plaintiff's treating psychologist three months later, and completed a Medical Source Statement in that role in March 2013. (T. 328-343, 347-50).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 15-19). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   **ALJ's DECISION**

As an initial matter, the ALJ determined that plaintiff met the insured status requirement for DIB benefits through June 30, 2002. (T. 14). At step one of the sequential analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability on June 15, 2001. (*Id*.). Next, the ALJ determined that plaintiff's depression, anxiety, OCD, and post-traumatic stress disorder ("PTSD") were severe impairments. (*Id*.). At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P., including Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (T. 15-16).

The ALJ next concluded that plaintiff retained the RFC to perform a full range of work at all exertional levels, but had certain nonexertional limitations. (T. 16). Specifically, the ALJ found that plaintiff was limited to performing simple, routine, and

repetitive tasks that were not at an assembly line or "production rate" pace. (*Id*.).

Plaintiff was also limited to simple work-related decisions, and could occasionally

respond appropriately to supervisors and co-workers, but never to the public. (*Id*.).

While the ALJ found that plaintiff's medically determinable impairments could

reasonably be expected to cause his alleged symptoms, the ALJ decided that plaintiff's

statements concerning the intensity, persistence and limiting effects of those symptoms

were not credible, to the extent that they were inconsistent with the rest of the record

evidence. (T. 17-18).

At step four, the ALJ concluded that plaintiff had no past relevant work. (T. 20).

The ALJ thus proceeded to step five and, taking into account the hearing testimony of

VE Beougher, determined that there were jobs that existed in significant numbers in the

national economy that plaintiff could perform. (*Id*.) Therefore, the ALJ determined that

plaintiff had not been under a disability from the alleged onset date of June 15, 2001

through the date of her decision. (T. 20-21).

## V.  ISSUES IN CONTENTION

Plaintiff makes the following claims:

(1)    The ALJ improperly determined that plaintiff's impairments did not meet
       Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).
       (Pl.'s Br. at 9-14) (Dkt. No. 11).

(2)    The ALJ's RFC determination improperly weighed the medical opinion
       evidence and was not supported by substantial evidence. (Pl's Br. at 18-
       23).

(3)    The Commissioner erred in evaluating plaintiff's credibility. (Pl.'s Br. at
       14-18).

(4)  The ALJ failed to properly develop the administrative record. (Pl's Br. at 23).

Defendant argues that the Commissioner's decision was supported by substantial evidence. (Def.'s Br. at 11-23) (Dkt. No. 12).  As discussed below, this court agrees with the defendant and will recommend dismissal of the complaint.

## VI.  LISTED IMPAIRMENTS

### A.  Legal Standard

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment.  *See* 20 C.F.R. §§ 404.1520, 416.920.  It is the plaintiff's burden to establish that his or her medical condition or conditions meet *all* of the specific medical criteria of particular listed impairments.  *Pratt v. Astrue,* 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) *(*citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)).  If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify."  *Id.*  In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment."  *Sullivan*, 493 U.S. at 531 (emphasis added).

### B.  Application

In this case, the ALJ found that although the plaintiff had depression, anxiety, OCD, and PTSD, the plaintiff's mental impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, in particular Listings 12.04 and 12.06. (T. 15-16).  Plaintiff contends that the ALJ erred in

her analysis of the "paragraph B" criteria, which are identical for the two listings.[2] To satisfy the paragraph B criteria, plaintiff's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ found that there were no episodes of decompensation in the record, and that plaintiff had mild restrictions in activities of daily living; moderate difficulties in social functioning; and mild difficulties in concentration, persistence, or pace. (T. 15-16). Plaintiff argues that he actually has marked limitations in all three of these areas. (Pl.'s Br. at 9-14).

In his step three analysis, the ALJ based her conclusion about plaintiff's activities of daily living on the function report plaintiff completed as part of his benefits applications. Plaintiff reported that he had no problems with personal care such as dressing, bathing, or grooming; that he didn't cook but could prepare simple meals from canned or boxed food; that he attempted housework when asked but had "no drive to do these things"; and that he did not go out often due to anxiety. (T.15, 226-27). Plaintiff also testified that he lived alone, took care of his personal needs, and had at

---

[2] To qualify as a listed impairment under Listing 12.04, the claimant's impairment must satisfy the criteria in both paragraphs A and B, or the criteria in paragraph C of that listing. To qualify as a listed impairment under Listing 12.06, the claimant's impairment must satisfy the criteria in both paragraphs A and B, or the criteria in both paragraphs A and C of that listing. Because the ALJ had determined at step two that plaintiff suffered from severe mental impairments including depression and PTSD, additional discussion of the paragraph A criteria in her decision was not required. *See Alsheikmohammed v. Colvin*, No. 6:14-CV-461 (GTS), 2015 WL 4041736, at *4 (N.D.N.Y. July 1, 2015).

different times fed and cared for pets, including a reptile and a dog. (T. 43, 285-86).

Plaintiff argues that while he was "nominally capable" of performing many activities of

daily living, his testimony demonstrated that his impairments prevented him from doing

so in a suitable or routine manner. (Pl.'s Br. at 10-14). For example, plaintiff testified

that he spent an hour brushing his teeth on the morning of the hearing, and that, when

dressing himself, he would have to take his socks off and put them on again if he felt

that he did not do it the right way. (T. 39). He also testified that he required the

assistance of family members on a regular basis to perform basic tasks such as taking

out the garbage, doing dishes, shopping, and taking the dog to the veterinarian. (T. 43).

With regard to social functioning, the ALJ considered plaintiff's testimony that

he did not engage in social activities due to a lack of social skills, but that he attended

Alcoholics Anonymous and Narcotics Anonymous meetings as part of his parole

obligations. (T. 64). Plaintiff described an "okay" relationship with his supervisor

when he briefly worked at a restaurant, but said that he did not socialize with the other

employees while he was there, and felt uncomfortable because he believed that they

knew that he was on parole. (T. 54). Plaintiff described similar "good" or "okay"

relationships with his supervisors during his other brief periods of employment, but

minimal interaction with co-workers. (T. 58, 62). The ALJ considered Dr. Stang's

March 2013 opinion that plaintiff had marked limitations in interacting appropriately

with supervisors, co-workers, and the public, but concluded that plaintiff's brief work

history and his testimony regarding the same reflected a more moderate limitation in

this functional area.[3]  (T. 15, 37-38, 51-62, 347-51).

With regard to concentration, persistence or pace, the ALJ considered the function report completed by plaintiff, which alleged problems paying attention and following instructions.  (T. 232-38).  She also considered plaintiff's testimony that he had walked out of his restaurant job due to the pressure of keeping up with orders, and Dr. Stang's March 2013 opinion that plaintiff had moderate limitations in his ability to understand, remember, and carry out simple instructions, and in his ability to make judgments on simple work-related decisions.  (T. 15-16).

The law is clear that in supporting her decision with substantial evidence, the ALJ cannot pick and choose only the parts of the record that support her determination, without affording consideration to the evidence supporting plaintiff's claim.  *Credle v. Astrue*, No. 10-CV-5624, 2012 WL 4174889, at *17, (E.D.N.Y. Sept. 19, 2012) (citing *Stewart v. Astrue*, No. 10-CV-3032, 2012 WL 314867, (E.D.N.Y. Feb. 1, 2012)).  The ALJ considers data provided by physicians, but draws her own conclusions as to whether the data supports a finding of disability.  *Id.* at *18 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  To the extent that reports are inconsistent, conflicts in the evidence are for the ALJ to resolve.  *Netter v. Astrue*, 272 F. App'x 54, 56 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)).  The ALJ need not reconcile every shred of evidence in support of her decision.  *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp. 2d 67, 78–79 (N.D.N.Y. 2005) (citations

---

[3] The ALJ incorporated some of the limitations described by Dr. Stang in her RFC determination.

omitted).

Here, the ALJ set forth the evidence relied upon for her step three analysis, including medical records, testimony, and plaintiff's functional report, and thus provided sufficient reasoning to explain her findings. (T. 15-16). An assessment of mental impairments at step three does not require the same level of detailed functional analysis as steps four and five. *Alsheikmohammed v. Colvin*, No. 6:14-CV-461 (GTS), 2015 WL 4041736, at *5 (N.D.N.Y. July 1, 2015) (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996)). Accordingly, the ALJ's determination that plaintiff did not meet Listings 12.04 and 12.06 was supported by substantial evidence. *Perez v. Colvin*, No. 13 Civ. 3713 (AJP), 2014 WL 2462992 (S.D.N.Y. June 2, 2014) (finding that substantial evidence supported ALJ's determination that plaintiff's mental impairments did not satisfy the listing requirements where plaintiff lived alone, maintained his personal hygiene, cleaned his house, prepared meals with minimal cooking, and traveled independently).

At the close of her step three analysis, the ALJ stated that there were no episodes of decompensation in the record, "which attests to a lack of disabling severity." (T. 16). Plaintiff contends that this statement constitutes legal error, because the absence of decompensation is not conclusive evidence that a plaintiff is not disabled. (Pl.'s Br. at 14). Because the ALJ properly considered all of the other record evidence in reaching her conclusions under the five step disability analysis, this court concludes that, to the extent that the ALJ overstated the impact of an absence of episodes of decompensation, any misstatement by the ALJ was harmless error. *See Zabala v. Astrue*, 595 F.3d 402,

409-410 (2d Cir. 2010) (finding that remand is unnecessary, notwithstanding a legal error, where the application of correct legal principles to the record could lead only to the same conclusion).

## VII. **RFC/TREATING PHYSICIAN**

The ALJ determined that plaintiff had the RFC to perform work at all exertional levels, with certain limitations associated with pace and the level of interaction with co-workers, supervisors, and the public. (T. 16). Plaintiff argues that the ALJ did not properly weigh the medical evidence in the record, resulting in an RFC that is not supported by substantial evidence. This court disagrees and will consider these two arguments together.

### A. **Legal Standards**

#### 1. **RFC**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the

evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute her own judgment for competent medical opinion. *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)) (Rep't-Rec.), *adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v. Comm'r of Soc. Sec.*, No. 6:00-CV-1225, 2005 WL 1899399 at *3 (N.D.N.Y. Aug. 2, 2005)). In addition to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue*, 2010 WL 2629832 at *6-7.

### 2.    Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that the report is rejected. *Halloran*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute

her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

## B. Application

Given the lack of physical impairments, the ALJ determined that plaintiff had the RFC to perform a full range of work at all exertional levels, but with certain nonexertional limitations due to his mental impairments. (T. 16). In particular, the ALJ found that plaintiff was limited to performing simple, routine, and repetitive tasks but "not at a production rate (an assembly line) pace," and was limited to simple work-related decisions. The ALJ concluded that plaintiff could occasionally respond appropriately to supervisors and coworkers but never to the public. (*Id*.).

In reaching this RFC determination, the ALJ gave "great weight" to the opinion of state agency psychiatric consultant, Dr. M. Totin, that plaintiff could perform low contact work. (T. 19). Dr. Totin reviewed the available medical records in connection with plaintiff's DIB and SSI applications, but such records were limited due to plaintiff's limited treatment history during his ten years of incarceration (T. 299, 313). While Dr. Totin concluded that there was insufficient evidence to substantiate the presence of a disorder prior to the date last insured, he relied upon a December 2011 consultative exam performed by Dr. Stang (prior to his role as plaintiff's treating physician) to assess plaintiff's functional limitations in connection with his SSI application. (*Id*.). Specifically, Dr. Totin noted Dr. Stang's findings that plaintiff was slightly apprehensive during the exam, but appeared courteous and demonstrated organized thought processes, fair insight and judgment, and intellectual functioning in

the low average to borderline range. (*Id*.).

During the consultative exam, plaintiff reported that he dressed, bathed, and groomed himself, but did not cook. (T. 285-86, 313). Plaintiff lived with his mother at the time, and she took care of the shopping and laundry for him. (T. 285, 313). He did not handle his own finances, but gave his mother rent and food money. (T. 285). Plaintiff described caring for his pet bearded dragon reptile, and stated that he enjoyed animals, walking through the woods, and fishing. (T. 286). He reported that "at present, he does not really do anything because he is kind of stuck and cannot go anywhere." (*Id*.).

Dr. Stang opined after the 2011 consultative exam that plaintiff was capable of performing basic work-related directions, but had very limited self confidence. (*Id*.) Stang also noted that plaintiff was nervous around authority figures, and tended to become anxious when he had to deal with the public. (*Id*.). Dr. Stang assigned plaintiff a psychiatric prognosis of "fair," and opined that plaintiff would benefit from individual psychotherapy and a psychiatric evaluation. (*Id*.). In Dr. Stang's opinion, if plaintiff were to hold a basic manual labor job, he would need a very supportive and understanding supervisor in order to help him increase his self-confidence. (*Id*.).

Plaintiff contends that the ALJ erred by assigning great weight to Dr. Totin's conclusion that plaintiff could perform low-contact work, because Dr. Totin did not provide a basis for his opinion. (Pl.'s Br. at 19-21). However, this argument is not supported by the record, as Dr. Totin cited the 2011 consultative exam and plaintiff's description of his own symptoms as the basis for his opinion. (T. 313). In addition, the

ALJ assigned Dr. Totin's opinion great weight because it was consistent with more recent medical evidence that was not part of the state consultant's review. (T. 19). For example, plaintiff visited Dr. Irena Kokot in February 2012 after developing numbness in his fingers. (T. 353). During the initial patient evaluation, Dr. Kokot questioned plaintiff regarding his depression symptoms and concluded that they were "mild." (T. 353). During an initial visit with Dr. Aimee Pierce in December 2012, plaintiff reported that he felt that "most of his depressed mood is due to difficulty with coping with incarceration for 10 years," but that he was "adjusting well at this time." (T. 369). Dr. Pierce described plaintiff as having a normal mood and affect, and exhibiting normal behavior. (T. 19, 362). Plaintiff also noted during this visit that he had a new job pending with his brother in a foreclosure business. (*Id*.).

Plaintiff argues that the ALJ should have instead given great weight to the March 26, 2013 Medical Source Statement by Dr. Stang, who had commenced a treating physician relationship with plaintiff in March 2012. (T. 329). In March 2013, Dr. Stang found that plaintiff's serious social fears and high level of anxiety caused marked limitations in his ability to interact appropriately with the coworkers, supervisors, and the public. (T. 349). Dr. Stang also found extreme limitation in plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id*.). Citing his initial treating assessment in March 2012 and plaintiff's presentation during psychotherapy sessions, Dr. Stang opined that plaintiff had moderate limitations in his ability to understand and carry out simple instructions and to make judgments on simple work-related decisions; marked limitations in his ability to understand and

remember complex instructions and make judgments on complex work-related decisions; and extreme limitations in his ability to carry out complex instructions. (T. 348). Dr. Stang concluded that these limitations first presented themselves when plaintiff was eighteen years old. (T. 349).

The ALJ assigned "minimal weight" to Dr. Stang's opinion for a variety of reasons. First, the ALJ noted the inconsistencies between the 2011 consultative exam and the March 2013 Medical Source Statement. (T. 19). The ALJ also found a lack of medical evidence, such as hospitalization, to support the marked and extreme limitations described by Dr. Stang in 2013, and noted the "routine nature" of most of plaintiff's psychotherapy visits. (T. 19, 346). The treatment notes support the ALJ's findings. In March 2012, Dr. Stang found plaintiff to be cooperative, with a goal-directed thought process and intact memory, judgment, and concentration. (T. 331-32). During several appointments in June 2012, July 2012, December 2012 and January 2013, plaintiff reported that he felt "less depressed." (T. 335, 339, 342-43). Plaintiff appeared to show progress in attending regular Alcoholics Anonymous meetings and committing to small steps to improve his life, but also missed several appointments with Dr. Stang and with a psychiatrist[4] without explanation. (T. 335, 342).

Plaintiff argues that any inconsistencies between Dr. Stang's December 2011 consultative examination and Dr. Stang's 2013 Medical Source Statement were a

---

[4] The record contains a November 16, 2012 intake assessment from psychiatrist Dr. Minhaj Siddiqi, but the one page assessment does not include an opinion on plaintiff's functional limitations, and the enclosed cover sheet notes that plaintiff had only seen Dr. Siddiqi once. (T. 345-46).

18

product of the deeper treatment relationship developed with plaintiff and the greater insight into plaintiff's impairments. (Pl.'s Br. at 19). However, the ALJ found that the restrictive findings in Dr. Stang's 2013 opinion were not only inconsistent with the psychologist's 2011 opinion, but also his treatment notes and the other available medical records. (T. 19). The ALJ also did not reject Dr. Stang's conclusions in their entirety. Rather, she incorporated Dr. Stang's concerns about plaintiff's limitations with regard to understanding and carrying out instructions, interacting with the public and others in the workplace, and difficulty keeping up with faster paced occupations into the RFC. (T. 16). Therefore, the ALJ appropriately evaluated the conflicting medical evidence, and made an RFC finding that was consistent with the overall record. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole).

## VIII. <u>CREDIBILITY</u>

### A. **Legal Standards**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the

substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(c), 416.929 (c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## B.    Application

The ALJ found that plaintiff's statements "concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible" due to inconsistencies with the record evidence.  (T. 17-18).  Plaintiff argues that the ALJ did not specifically discuss the above factors, and failed to appreciate the reasons for plaintiff's failure to seek mental health treatment during his incarceration.

The ALJ's failure to specifically discuss the seven factors above does not require remand when the ALJ thoroughly discussed her credibility determination, and "the record evidence permits [the court] to glean the rationale of the ALJ's decision." *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013).  In *Cichocki*, as in this case, the ALJ found that plaintiff's medical impairments could cause the alleged symptoms, but declined to credit the plaintiff's testimony "regarding the intensity, persistence, and limiting effects of the symptoms to the extent that they were inconsistent with the medical evidence . . . ." (*Id.*).

Here, the ALJ found that while plaintiff alleged that his disability dated back to the age of eighteen, he had a limited history of mental health treatment prior to, during and after his incarceration, and was not taking any psychiatric medication at the time of the hearing.  (T. 17).  Plaintiff's testimony, to the extent that it described restrictions more extreme than that accepted by the RFC, also conflicted with Dr. Stang's treatment notes, and the other available medical evidence described above.  Accordingly, the ALJ concluded that plaintiff's testimony that he could not work at all  because of his mental problems was not credible, but she included certain limitations in her RFC

determination that reflected the impact of plaintiff's severe mental impairments on his overall ability to function. (T. 16, 20).

Plaintiff's counsel argues that the ALJ's credibility determination is further flawed because the ALJ did not adequately consider the reasons for plaintiff's failure to seek mental health treatment during his ten years of incarceration, as well as the root cause of plaintiff's PTSD. (Pl.'s Br. at 16-17). The ALJ characterized plaintiff's refusal to seek mental health treatment in prison as a reaction to "differences" with the prison therapist and because plaintiff felt "blown off" when he requested treatment. (T. 18-19). During his consultative exam, plaintiff reported to Dr. Stang that he was sexually assaulted by a correctional officer at Auburn Correctional Facility in 2002, and later attacked by correctional officers at the same facility. (T. 281). When he sought counseling from the prison therapist, she was "very abrupt" with him, and plaintiff later saw the therapist talking to the officer that he had accused of sexual abuse. Plaintiff thus gave up on the idea of seeking mental health treatment during his incarceration.[5] (*Id.*).

Plaintiff's counsel argues that the ALJ's description misrepresents plaintiff's interaction with the Auburn Correctional Facility mental health therapist, and therefore undermines the credibility determination. However, while the ALJ omitted all of the details offered by plaintiff, her description was accurate. For example, plaintiff testified that he refused mental health treatment in part because the therapist insisted

---

[5] The court notes that plaintiff testified that he served five years at Auburn Correctional Facility, and the record reflects that he was subsequently transferred to Mohawk Correctional Facility in Rome, New York.

that he begin taking Prozac as a condition of treatment. (T.41). In addition, as part of her credibility assessment, the ALJ referenced "two incidents" in prison as a potential source of plaintiff's PTSD, as well as "numerous brutal incidents [plaintiff] witnessed" during his incarceration. (T. 18). The ALJ cited the 2011 consultative exam in which plaintiff described the prison assaults for this point, but noted that plaintiff did not offer any further details of the incidents at his subsequent visits with Dr. Stang. (T. 18). Because the ALJ adequately addressed the factors that influenced her credibility determination, that determination is supported by substantial evidence.[6]

## IX.  DEVELOPING THE ADMINISTRATIVE RECORD

### A.    Legal Standard

It is well-settled that, because a hearing on disability benefits is a nonadversarial proceeding, the ALJ has an affirmative duty to develop the record, whether or not a plaintiff is represented. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). Prior to March of 2012, the regulations provided that when the treating physician's report contained "a conflict or ambiguity" that must be resolved, the ALJ was required to "seek additional evidence or clarification" from that source in order to fill in any clear gaps before rejecting the doctor's opinion. *Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 504-505 (S.D.N.Y. 2014) (citing, *inter alia, Correale Englehart v. Astrue*, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010); 20 C.F.R. §§ 404.1512(e)(1),

---

[6] Defendant's counsel correctly notes that plaintiff's past substance abuse and criminal history were permissible factors for the ALJ to consider when assessing credibility. *See Netter*, 272 F. App'x at 55; *Rutkowski v. Astrue*, No. 8:07-CV-916, 2009 WL 2227282, at *16 (N.D.N.Y. July 23, 2009). However, the ALJ did not discuss these issues as part of her credibility determination.

416.912(e)(1) (2010)).  This duty arose if the physician's report was "insufficiently

explained, lacking in support, or inconsistent with the physician's other reports." *Id.*

Effective March 26, 2012, the Commissioner amended 20 C.F.R. §§ 404.1512

(e)(1) and 416.912(e)(1) to remove former paragraph (e), together with the duty that it

imposed on the ALJ to re-contact the treating physician under certain circumstances.

*Lowry v. Astrue*, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (citing <u>How We Collect and

Consider Evidence of Disability</u>, 77 Fed. Reg. 10,651, 10,656 (Feb. 23, 2012) (codified

at 20 C.F.R. § 416.912) (deleting former paragraph (e) and redesignating former

paragraph (f) as paragraph (e)).  The court applies the section in effect when the ALJ

adjudicated plaintiff's claim. *Id.*  The ALJ's decision in this case is dated May 22, 2013,

thus, the new section applies.

The new section allows the ALJ to choose the appropriate method for resolving

insufficiencies or inconsistencies, which is designed to afford adjudicators "more

flexibility." *Perrin v. Astrue*, No. 11-CV-5110, 2012 WL 4793543, at *3 n.3 (E.D.N.Y.

Oct. 9, 2012) (citing <u>How We Collect and Consider Evidence of Disability</u>, *supra*).

The ALJ must attempt to resolve the inconsistency or insufficiency by taking one or

more of the following approaches:

> (1) recontacting the treating physician or other medical
> source, (2) requesting additional existing records, (3) asking
> the claimant to undergo a consultative examination, or (4)
> asking the claimant or others for further information.

*Id*. (citing 20 C.F.R. §§ 404.1520b(c)(1)-(4), 416.920b(c)(1)-(4)).

Despite the duty to develop the record, remand is not required where the record

contains sufficient evidence from which the ALJ can assess the plaintiff's RFC. *Covey v. Colvin*, No. 13-CV-6602, 2015 WL 1541864, at *13 (W.D.N.Y. Apr. 6, 2015) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013)).

### B. Application

Plaintiff argues that the ALJ should have further developed the administrative record through several steps: ordering an independent consultative examination of plaintiff; contacting Dr. Stang for clarification regarding his opinion; and obtaining additional medical records, including any available from plaintiff's incarceration. This court disagrees.

An ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it. *Lefever v. Astrue*, No. 5:07–CV–622 (NAM/DEP), 2010 WL 3909487, at *7 (N.D.N.Y. Sept. 30, 2010), *aff'd* 443 F. App'x 608 (2d Cir. 2011); *see also Yancey v. Apfel*, 145 F.3d 106, 114 (2d Cir.1998). The hearing transcript demonstrates the ALJ's efforts to ensure that she was provided an adequate record to make her decision. For example, the ALJ questioned plaintiff on any medical treatment that predated his treatment with Dr. Stang. Plaintiff testified that he had briefly sought treatment at an outpatient drug rehabilitation program in 1994, seven years before the alleged onset date, and was diagnosed with OCD. (T. 35). He was prescribed Prozac through this program, but he only took it once because it made him feel uncomfortable. (*Id.*). Plaintiff testified that ". . . I stopped taking it, and then I started getting in trouble, and getting incarcerated." (T. 34-35). Plaintiff also testified that he attempted to see a doctor upon completion of his first prison sentence, in

approximately 1998, but he was refused due to a lack of medical insurance. (T. 32).

As discussed above, plaintiff repeatedly advised the ALJ that he did not seek any mental health treatment while incarcerated. (T. 33, 40-41). When the ALJ questioned whether there were any medical records from plaintiff's incarceration, plaintiff's counsel at the administrative hearing[7] acknowledged that the limited paperwork from the Auburn Correctional Facility, showing infirmary visits for physical injuries in 2004 (T. 271-78), was "all that's available from what I understand." (T. 41).

The ALJ, while expressing initial confusion at the hearing about Dr. Stang's dual role as consultative examiner and treating physician, provided a detailed assessment of all the medical evidence in the record. (T. 18-19). The ALJ also questioned plaintiff about any recent medical records that may be available. (T. 48-50). Plaintiff testified that he had recently begun seeing Dr. Aimee Pierce as a primary care physician, but that "she didn't have any records of me either," and that Dr. Pierce was in the process of requesting any available prison medical records. (T. 49). The ALJ provided plaintiff's counsel at the hearing twenty days to obtain "whatever Dr. Pierce has," and additional records were made part of the record in May 2013. (T. 49, 73, 359-71). The only other medical source identified by plaintiff was a psychiatrist, Dr. Siddiqi, whom plaintiff had seen only one time. (T. 345). Plaintiff's legal counsel at the hearing advised the ALJ that the material from Dr. Siddiqi in the record constituted the entire file from that physician. (T. 49).

Despite plaintiff's speculation that other relevant medical records may exist,

---

[7] Plaintiff retained different legal counsel for this proceeding.

none were provided to the Appeals Council or to this court.  Therefore, based on the ALJ's analysis of the medical evidence and her reasonable efforts to obtain any other medical records that may have been available, there were no obvious "gaps in the record," and the ALJ's determination was supported by substantial evidence.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:       January 21, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge